STATE of Wisconsin, Plaintiff-Respondent,

v.

Walter William McCoy, Defendant-Appellant.

Court of Appeals

*No. 2006AP522–CR. Submitted on briefs December 5, 2006.
—Decided December 27, 2006.*

2007 WI App 15

(Also reported in 728 N.W.2d 54.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general by *Daniel J. O'Brien*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Kessler, JJ.

¶ 1. WEDEMEYER, P.J.   Walter William McCoy appeals from a judgment entered after a jury found him guilty of three counts of first-degree sexual assault. McCoy claims that the trial court erroneously exercised

its discretion in admitting physical evidence and expert testimony regarding DNA testing results based on insufficient proof as to the chain of custody. Because the chain of custody of the physical evidence was sufficient to satisfy the requisite standard, we conclude that the trial court did not erroneously exercise its discretion in admitting the evidence. Accordingly, we affirm.

## BACKGROUND

¶ 2.    Early in the morning of October 8, 1995, the victim, Collette J., was held at knifepoint by an unknown black male, who demanded her money. When she told him she did not have any money, he dragged her into a secluded field. Once there, he threatened to kill her if she made any sounds. He then repeatedly sexually assaulted her.

¶ 3.    After the assault, Collette reported the incident to police and went to the hospital where she was examined by Helen Kelly, a sexual assault nurse examiner. Samples were taken from Collette's body and items of clothing were kept as evidence. The samples collected included fragments from a tampon retrieved from the victim's vagina, blood, oral smear, vaginal smear, cervical smear, saliva standard, vaginal swabs, cervical swabs, oral swabs, swab from left thigh, swab from side of lip, swab from right calf and swab from face area.

¶ 4.    McCoy was not charged until April 2004. In January 2004, a routine search of the Wisconsin DNA databank revealed a match between the evidentiary profile developed from the items, which police had inventoried and submitted to the state crime lab, and the profile of a convicted offender in the convicted offender index. The databank matched McCoy, who had submitted a DNA sample to the sheriff's department in April 2003, following an unrelated felony conviction.

¶ 5. When McCoy was arrested, he voluntarily waived his *Miranda*[1] rights. He confessed to committing the attempted robbery, dragging the woman to a secluded area, and committing the sexual assaults.

¶ 6. In April 2005, McCoy's case was presented to a jury. The jury found him guilty of three counts of sexual assault. He was sentenced to three concurrent fifteen-year prison terms. Judgment was entered. McCoy now appeals.

## DISCUSSION

■

¶ 7. McCoy claims that the trial court erroneously exercised its discretion when it permitted the State to introduce the physical evidence and related testimony regarding the DNA results. McCoy argues that the State failed to establish a sufficiently reliable chain of custody as to the items collected by Nurse Kelly. The State responds that the chain of custody of the challenged evidence was sufficient to satisfy the requisite standards and any issues with the chain of custody go to its weight, not its admissibility. We conclude that the trial court did not erroneously exercise its discretion in permitting the challenged evidence.

■

¶ 8. The issue in this case is whether the State presented sufficient proof to establish a chain of custody. Our standard in reviewing this issue is discretionary. *State v. Simmons*, 57 Wis. 2d 285, 295–96, 203 N.W.2d 887 (1973). Thus, we review whether the trial court considered the pertinent facts, applied the correct law, and reached a reasonable determination. *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 9. The law with respect to chain of custody issues requires proof sufficient "to render it improbable that the original item has been exchanged, contaminated or tampered with." *B.A.C. v. T.L.G.*, 135 Wis. 2d 280, 290, 400 N.W.2d 48 (Ct. App. 1986). WISCONSIN STAT. § 909.01 (2003–04)[2] provides: "The requirements of authentication or identification as a condition precedent to admissibility are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A perfect chain of custody is not required. *United States v. Moore*, 425 F.3d 1061, 1071 (7th Cir. 2005). Alleged gaps in a chain of custody "go to the weight of the evidence rather than its admissibility." *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988).

¶ 10. The State proffered the following proof with respect to the chain of custody of the evidence challenged here. Nurse Kelly positively identified the proffered evidence at trial. She identified her packaging, her personal seals, the date she put on the seals and her initials. Nurse Kelly was the person who actually retrieved the tampon fragments from the victim on October 8, 1995, and placed them into the evidence bags. Nurse Kelly further identified the larger bag in which she placed the tampon fragments and all the other items of evidence that she retrieved from the victim on the date of the assaults. She also described how she properly packaged, sealed and stored the evidence at the hospital.

¶ 11. The next person in the chain of custody was Milwaukee Police Lieutenant Mercedes Cowan, who was the police officer who took the victim from the

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

scene to the hospital for the examination. Cowan testified that she retrieved the bag packaged by Nurse Kelly and brought it back to the police department. She indicated that at the police department, she made sure that every item of evidence listed was in fact inside the bag. Then Cowan repackaged the items of evidence and inventoried them on the Milwaukee Police Department inventory forms.

¶ 12. Cowan also testified about the routine with respect to picking up the evidence. She stated that the police would receive a call from the hospital security officer and would then go to the hospital and pick up the evidence. The hospital security officer would retrieve the evidence, which had been placed in a secured locker, and then turn the evidence over to the police officer. Signatures of both the police officer and the security officer were exchanged. The police officer then took the evidence directly to the police department and completed the police reports.

¶ 13. Cowan positively identified the police inventory forms she filled out with respect to the evidence collected on October 8, 1995. She also identified the Department of Justice State Crime Lab form, which she had filled out. This form lists all of the items sent by police to the state crime lab for testing. The items inventoried matched the items sent to the crime lab. Cowan was also able to positively identify the evidence at the time of trial based on her initials, her seal, and her payroll number.

¶ 14. The next witness was State Crime Lab Forensic Scientist Gretchen DeGroot, who testified that she had examined the items sent from the police to the crime lab for the first time in September 1997. She generated a report from the items submitted in this case. DeGroot testified that the items came to her in a

sealed condition as her tests were the first time the evidence was being tested. She indicated that the evidence had not been accessed or opened by anyone as evidenced by the sealed condition until she opened it. She indicated that she opened the bag, tested the evidence, and then returned it to the crime lab storage room. At trial, DeGroot positively identified the tampon she had examined. She was also able to confirm that the evidence contained her own initials, the date she examined the evidence, and the crime lab case number. She testified that all of the items of evidence appeared to be intact for the entire time from October 1995, until she retrieved them and examined them in September 1997.

¶ 15. The next person in the chain of custody was State Crime Lab Forensic Scientist Sharon Polakowski, who examined the evidence in July 2001. Polakowski extracted DNA from semen on the tampon fragments and, using new DNA analysis techniques, was able to obtain a male DNA profile. In January 2005, Polakowski received a sample of McCoy's DNA and compared it to the DNA profile she had obtained in July 2001, from the tampon fragments. The DNA matched.

¶ 16. McCoy argued that the chain of custody was insufficient. He contended that there was no testimony which explained how the evidence got from the police department to the crime lab, or where the evidence was stored during the two-year period between Cowan inventorying it and DeGroot testing it for the first time. He also points out that there is no testimony as to where the evidence was stored between the time DeGroot finished her testing and Polakowski began her testing. He also challenges the evidence based on the lack of testimony regarding the evidence's location and condition between 2001 and 2005.

¶ 17. The trial court, in ruling that the evidence was admissible, reasoned:

> Well, I agree that there certainly are holes in what used to be the continuous chain of custody that was put in.
>
> But I do think that it is true that we've got the items being taken from the victim, being identified at the Sexual Assault Treatment Center, being put into packages, put into a bag. We have the lieutenant picking that bag up, repackaging them. And Ms. De-Groot testifying that she opened and she identified her own seals and the other seals on at least one or two of the items. It's not perfect.
>
> But I agree that we've got an adequate chain of custody from the Sexual Assault Treatment Center to the crime lab. And there are lots of things that can be argued. I agree that we didn't get from Ms. DeGroot that the evidence was put back into wherever it was. And she did say resubmitted. And we don't know whether that means it went back to MPD and came back to the crime lab. I agree. But I think that the chain tracking the items of DNA that were subsequently tested is adequate for purposes of allowing the evidence to come in.

¶ 18. We agree with the trial court. We start by acknowledging that the chain of evidence in this case is not perfect. There are substantial time gaps as pointed out by McCoy. Nonetheless, the chain of custody evidence was sufficient to support the trial court's conclusion that it was admissible. "The standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed." *Moore*, 425 F.3d at 1071 (citation omitted). This standard was satisfied here. Several witnesses

testified that the physical evidence was what it purported to be and Nurse Kelly positively identified it as the same evidence she had packaged on the date of the crime.

¶ 19.   Provided that standard is satisfied, gaps in the chain of evidence "go to the weight of the evidence rather than its admissibility." *Id.* (citation omitted). Thus,

> "the government need only show that it took reasonable precautions to preserve the original condition of the evidence, it does not have to exclude all possibilities of tampering with the evidence . . . . [a] presumption of regularity exists with respect to official acts of public officers and, absent any evidence to the contrary, the court presumes that their official duties have been discharged properly."

*Id.* (citations omitted). The State satisfied this standard. All of the witnesses that testified for the State described the precautions taken to preserve the evidence. Moreover, we presume that the public officers properly discharged their duty with returning the evidence to secured storage. McCoy fails to present any evidence to indicate that this evidence was tampered with, contaminated or exchanged. His argument simply consists of rank speculation based on the length of time between testing and DNA identification. Such argument is insufficient to overcome the presumption of regularity.

¶ 20.   Thus, we conclude that the witnesses who testified for the State provided sufficient foundation and authentication to convince this court that the evidence in question "is what its proponent claims" it is. *See* WIS. STAT. § 909.01. The chain of custody was sufficient to allow its admissibility. The markings and

seals personally placed on the evidence by all four of the witnesses who handled the evidence allowed them to each positively identify the evidence and independently recall what they did with the evidence. The absence of any additional markings or initials indicates that no one else handled this evidence between October 1995 and the trial. Moreover, the testimony from these four witnesses provided the jury, acting reasonably, with a sufficient basis to conclude that the tampon fragments introduced into evidence at trial were the same, and in substantially the same condition, as the fragments retrieved in October 1995 from the victim. Accordingly, the trial court did not erroneously exercise its discretion in admitting this evidence. Any basis for challenging the time gaps in the chain of custody was relevant to the weight of the evidence—not its admissibility.

*By the Court.*—Judgment affirmed.