COURT OF APPEALS
DECISION
DATED AND FILED

May 6, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP209-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF1666

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

NATHANAEL R. BENTON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1   PER CURIAM. Nathanael R. Benton appeals from a judgment convicting him of several crimes, including attempted first-degree intentional

homicide. He contends that there was insufficient evidence to support that conviction. He further contends that the circuit court erred in admitting evidence of other crimes against him. Finally, he challenges certain evidence on chain of custody grounds. For the reasons that follow, we reject Benton's arguments and affirm the judgment.

¶2 At around 2:00 a.m. on November 6, 2020, police officers M.H. and M.S. responded to a reported hit-and-run accident near a hotel in Delafield. There, they encountered Benton and his two traveling companions, Brian Morton and Ashley Johnson, outside the hotel. The three were travelling from Morton's home in Indiana.

¶3 The police officers did not know when they approached Benton for questioning that he was wanted for a burglary in Minnesota and an attempted homicide in North Dakota, both of which he had committed days earlier. Likewise, they did not know that Benton was armed with multiple guns and had previously told others[1] that he would engage in a shootout with police if they tried to stop him.

¶4 When M.H. attempted to frisk Benton for weapons, Benton pulled out a .40 caliber handgun from his waistband and shot both M.H. and M.S. Benton shot M.H. twice—once in the leg and once in the finger. Meanwhile, he shot M.S. three times—once in the pelvis and twice more in the back after M.S. had fallen to the ground. The shot to M.S.'s pelvis cut through his stomach and intestines before lodging in his left hip. It required four surgeries and caused

---

[1] Benton told both Morton and a woman named Tiffany Bach of his planned shootout.

permanent nerve damage.  The shots to M.S.'s back, however, were stopped by a protective vest he was wearing.

¶5      When Benton was apprehended hours later, he was warned that he would be put on the ground if he resisted.  In response, Benton exclaimed, "like that bitch last night, betcha that bitch ended up on the ground"—apparently referring to M.S.  Benton later described police officers as "fucking pigs" and said, "I hope they're dead."  Finally, while restrained in a suicide jacket in the jail, Benton complained that he did not need the jacket because he did not try to kill himself; rather, he "tried to kill two cops."

¶6      The State charged Benton with multiple crimes, and the case proceeded to a jury trial.  Before trial, Benton sought to exclude evidence of his burglary in Minnesota and attempted homicide in North Dakota.[2]  The circuit court denied that request, finding the evidence to be permissible panorama evidence.  Later at trial, Benton challenged certain evidence (i.e., a bullet retrieved from the hospital after one of M.S.'s surgeries and testimony about it) on chain of custody grounds.  The court denied that request too, noting that any gaps in the chain of custody went to the weight of the evidence rather than its admissibility.

¶7      Ultimately, the jury found Benton guilty of attempted first-degree intentional homicide for his actions towards M.S.  It also found him guilty of recklessly endangering the safety of M.H. and possession of a firearm by a felon.[3]

---

[2] The evidence was introduced via statements Benton had made to others about the crimes.  This led Benton to testify about them too.  A detective also testified that Benton had a warrant for his arrest.

[3] All of Benton's convictions included various penalty enhancers.

The circuit court imposed an aggregate sentence of 80.5 years of initial confinement and 30 years of extended supervision. This appeal follows. Additional facts are set forth below.

¶8    On appeal, Benton first contends that there was insufficient evidence to support his conviction for attempted first-degree intentional homicide. He maintains that the State failed to prove that he intended to kill M.S., which is an element of the offense. *See* WIS JI—CRIMINAL 1070.

¶9    In reviewing the sufficiency of the evidence to support a conviction, we may not substitute our judgment for that of the jury unless the evidence, viewed most favorably to the State and the conviction, is so lacking in probative value and force that no jury, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). Therefore, if more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict. *Id.* at 506-07.

¶10    In this case, we are satisfied that there was sufficient evidence to convict Benton of attempted first-degree intentional homicide. As noted, Benton shot M.S. three times—once in the pelvis and twice more in the back after M.S. had fallen to the ground. A still photo taken from M.H.'s body camera showed Benton in a shooter's stance, pointing and firing his weapon directly at M.S. at close range. From this, the jury could reasonably infer that Benton intended to kill M.S. Indeed, Benton's statements to others after the shooting confirm that intent.

¶11    Benton next contends that the circuit court erred in admitting evidence of his burglary in Minnesota and attempted homicide in North Dakota. He complains that such evidence was prejudicial.

4

¶12 A circuit court's decision to admit evidence is committed to its sound discretion. *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. We generally look for reasons to sustain discretionary decisions. *State v. Lock*, 2012 WI App 99, ¶43, 344 Wis. 2d 166, 823 N.W.2d 378.

¶13 Here, we agree with the circuit court that evidence of Benton's burglary in Minnesota and attempted homicide in North Dakota constituted permissible panorama evidence. That is because it was "needed to completely describe the crime that occurred and is thereby inextricably intertwined with the crime." *State v. Dukes*, 2007 WI App 175, ¶28, 303 Wis. 2d 208, 736 N.W.2d 515. Without such evidence, Benton's violent response to the police officers' contact made little sense. The serious charges he was facing in Minnesota and North Dakota were relevant to show his motive and intent to avoid apprehension at all costs. This, in turn, helped explain why he shot M.H. and M.S. To the extent that the evidence was prejudicial to Benton, we conclude that it was not unfairly so.

¶14 Finally, Benton challenges certain evidence (i.e., a bullet retrieved from the hospital after one of M.S.'s surgeries and testimony about it) on chain of custody grounds. He argues that the chain of custody was insufficient to allow the evidence's admission.

¶15 A circuit court's decision to admit evidence over a chain of custody objection is also committed to its sound discretion. *See State v. McCoy*, 2007 WI App 15, ¶8, 298 Wis. 2d 523, 728 N.W.2d 54 (2006). Again, we generally look for reasons to sustain discretionary decisions. *Lock*, 344 Wis. 2d 166, ¶43.

¶16 At trial, M.S. testified that a bullet lodged in his left hip was extracted during his third surgery and saved as evidence in the case. Waukesha

County Sheriff's Detective Alex O'Toole also testified that, after that surgery, he received a call from the hospital telling him that he could pick up the bullet at its security office. Detective O'Toole did so and proceeded to take the bullet, which was in a clear container, to the evidence room at the sheriff's office. He then placed the bullet in a different container with a protective cloth inside. The bullet was later compared with two bullets recovered from M.S.'s protective vest.[4] A firearms and toolmark examiner from the Wisconsin State Crime Laboratory testified that all three bullets were fired from the same .40 caliber handgun found near Benton when he was apprehended.[5]

¶17 In making his chain of custody objection, Benton notes that no one testified about what happened to the bullet between the time it was surgically extracted from M.S. to the time Detective O'Toole retrieved it from the hospital's security office. Thus, Benton questions whether the requirements of authentication or identification were met to admit the bullet and testimony about it. *See* WIS. STAT. § 909.01 (2023-24).[6]

¶18 It is true that no witness testified about what happened to the bullet between the time of its extraction to the time of its retrieval. However, "[a] perfect chain of custody is not required" for evidence to be admissible. *McCoy*, 298 Wis. 2d 523, ¶9. Where, as in this case, there is a sufficient basis to support a finding that the item in question is what its proponent claims it to be, "[a]lleged

---

[4] Benton does not challenge the chain of custody of the bullets recovered from M.S.'s protective vest.

[5] Benton was the only source of DNA found on the .40 caliber handgun.

[6] All references to the Wisconsin Statutes are to the 2023-24 version.

gaps in a chain of custody 'go to the weight of the evidence rather than its admissibility.'" *Id.*, ¶¶9, 19-20 (citation omitted). Because that is exactly what the circuit court held, we perceive no error in its decision.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.